Yes. Good morning, Your Honors. Ben Coleman for Mr. Marsh. I'd like to save two minutes for rebuttal. How many? Two? Two. Okay. And what I'd like to do is focus on the loss issue, unless the Court had a different preference. With respect to the loss issue, I just wanted to briefly recount what I believe are the undisputed facts, and then just talk a little bit about the procedural history, because I think it relates to the government's waiver argument, and then hopefully actually get to the merits of the issue. I think the undisputed facts are that Mr. Marsh and some of his co-defendants stole an enormous number of checks, and those checks totaled over $18 million. But the undisputed facts also show that of those stolen checks, only approximately $980,000 were cashed, and that two co-defendants, one named Hall and the other named Muhammad, destroyed or burned all the other checks. Those, I believe, are the undisputed facts in the case. These loss cases, which we're getting more and more of now, there is a very interesting issue. We had one yesterday dealing with real estate fraud and somebody trying to convert co-ops into condos, and you get the question of what's the value of those things? What loss is involved? What did the parties intend? And one of the issues that seems to be, at least on my mind, and maybe you can address it, is what benefit, if any, ought your client to have as a result of the actions of third parties? It appears, at least on the record, that the fact that these checks were destroyed was almost an advertence. Your client didn't direct that, it just happened. Why should your client have the benefit of that having happened? And what, as a corollary to that, the government ended up replacing these things. Why should your client benefit from the fact that these victims didn't suffer as a result of that? Well, I guess to answer the first part of the question, I think the government cannot have it both ways. On the one hand, the government is claiming that Mr. Marsh directed everything and he was ordering everybody to do certain things, and that he told Muhammad and Hall to destroy the checks that did not fall within a particular range because they were undesirable checks to be cashed. So I think that the government can't have its cake and eat it, too. If Mr. Marsh is the one that's directing the operation here and telling people what to do, then he's not just getting a windfall because third parties happened to destroy the checks. He himself was calling the shots and said, we don't want these checks that are either too little or too great, destroy them, get rid of them. So I think that, I don't think that he's just benefiting from actions of third parties. That would be the response to the first part of the question. With respect to the second part of the question, I believe the way loss is calculated is one of two ways. It's either actual loss or intended loss. And in this case, if the victims who, if any victims had come forward and the government presented evidence that these victims somehow suffered some type of pecuniary loss because they didn't receive their check on time or whatever it may have been, or that the government itself suffered some additional loss because they had to reproduce new checks and send them out to the victims. If they had introduced that evidence, well, then maybe they would have an argument that some additional loss on top of the $980,000 should be considered. But in this case, the government offered no such evidence. The only evidence we have is that $980,000 were improperly cashed. And that was the actual loss in this case. There might have been some heartache that the recipients who didn't receive. But your client intended to steal the checks, right? They certainly intended to steal all the checks. Right. The question was whether they intended to cash all the checks and to cause loss. Because the question is what is, the question is not for loss purposes. It's not intended steal. It's intended loss. What is the loss that the defendants intended to cause? And in this record that he didn't, he wanted them not to take the certain checks. But time said they couldn't separate. So they took them all. That's what I think the court was referring to when he asked you about benefiting. Because they did take them all. And I'll use your words. Is it he getting his cake and eating it too? He says take all the checks and later on decides to destroy the ones that are less than $1,000. Well, I think his preference would have been for Hall just to take the checks that he wanted. But Hall took them all and there's no doubt that he took all the checks. No, Hall took them all, didn't he? Because he couldn't separate them at the post office. Right. And if they had just held on to all the checks and didn't destroy the other ones, then I think there might be a plausible argument from the government that he intended, there's a possibility that he intended to cash all the checks. But when they took the step of destroying all the checks that they didn't cash, it was clear that their intent was not to cause loss for these destroyed checks. I mean, there was no way that they could go to a bank with a shriveled up, burnt check and try to deposit it. I mean, the intent was clear. We're not going to cause any additional loss. We're just, this is the $980,000 that we got. This is the only loss that we intended. And I don't think he's necessarily getting a windfall. At what point do you measure the intent? When they first left the post office, the checks weren't separated. There was clearly an intent to take all the checks. Do we measure at that point or do we measure at some later point when he says, let's just separate these things out and they actually do that? Well, I think, you know, I think you do it at the later point because, I mean, the government wants to say that this is an ongoing conspiracy and we look at all the conduct. When you look at relevant conduct, you look at the entire scheme, the entire course of the operation. And I think we need to look at the intent from the entire course of the operation. And what the intent was, was, you know, we get the checks. Why wouldn't the moment be the moment that they take the checks from the post office? That the loss, the intended loss was what they took from the post office. Why wouldn't that be an appropriate measure? Well, even if that was the focal point, that was the point in time where you measured it, you know, I don't think there was any intent to cause any specific loss at that time. I don't think they knew what checks they were going to get. They intended to cause the loss at that point of whatever happened to be in that batch of checks, right? No, not whatever they felt they wanted to cash. I mean, when the checks were stolen, they didn't know whether they were going to get $5 or $500 million. They don't know how much the checks are. The checks come back. They go through the checks. The ones that they don't want, they destroy. So, I mean, I don't think that you could measure their intent at the specific time that the checks were taken because they didn't know what was going to be there. But the full reach of the intent was to steal all the checks in the beginning. And then again, why should he benefit because they happened to be $1,000 or less afterwards and it wasn't worth his time? Because I do believe that under the guidelines, the definition is intended loss, not intended theft. And the question is what loss did he intend to cause? And if it just said intended theft, it might be a different story. But we're measuring intended loss. What is the loss that he intended to cause? And in this case, I think that the loss, the intent for the loss was simply those checks that were cashed. Let's assume for a moment that all the checks were $100,000 each. They were going to cash all. He didn't know that at the time. But he takes all of the checks at that point. Would you agree that at that point, the value of the checks measured at the time that they were taken from the post office is the measuring moment, if you will? He knew that they were all going to be $100,000 checks. No, he didn't know that. He just knew he was taking the checks. And whatever happened to be in there, he had them. But it turns out they were all $100,000 checks. I still maintain that when you're focusing on intended loss, that's the definition, the focal point, the relevant time period is what loss did he intend. And if he brought all these checks and he got them all and then he opens them up and they're all $100,000 and he decides I don't want to cash all these, my intent is not to cash all these because I'm going to get caught if I cash $50,000, $100,000 checks. I only am going to cash one. His intent, the loss that he intends to cause is at that point in time that he determines these are the checks that I intend to cash. How do you square that, though, with the notes and with the sentencing guidelines? I mean, I just don't understand that. He clearly wanted the checks. He didn't know in advance how much the checks were going to be for. But he wanted all the checks. They took them out of the post office. He certainly intended that those checks be cashed if they were of a sufficient value. But the fact is he didn't know at the time. So the intent was that whatever was in there was arguably part of what would be lost. Then the only question is, subsequent to that, did the amounts turn out to be sufficiently low that it wasn't worth his time? And what benefit, if any, should he have from that? Well, I guess, I mean, the one side of the coin is saying what benefit should he get. I guess the question is what benefit should the government get. I mean, why should the government get the benefit of some incredibly high sentence if there was no additional loss? By the way, I've let you run over your time here. You've only got like nine seconds. Do you want to hold that? The only nine seconds I want to say is the only case I could find, and it's not controlling, that was somewhat on point was the Osborne case from the Tenth Circuit. And the way the Court calculated loss in that case corresponded with our position. They discarded or they did not count the checks that were discarded. Okay. Thank you very much. We'll now hear from the government. Good morning, Your Honors. My name is Donald Gaffney. On behalf of the United States Government, may it please the Court. I think you have to measure loss at the time the checks are stolen. Otherwise, the series of events doesn't make any sense. If we take the defense perspective that loss is not measured at the time the checks are stolen, then what is the intent when the checks are stolen? Someone's not just collecting checks like a coin collection here. The intent is to steal the checks and then cash them. In the example that Your Honor gave, if it turns out, and remember from the record, these bundles are in 600, 700 checks at a time. If it turns out that George Hall stole a bundle of checks, 600 checks, and they were all at $10,000, every single one of those checks would have been cashed because that was the intent when the bundle itself was stolen. I also want to point out to the Court that on the record before the Court, six to seven, I believe, or seven to eight deliveries of those bundles were made by George Hall to the defendant, in which case George Hall didn't separate out the checks that were under $1,000. He simply said, here, here are all of the checks. None of those checks were ever returned to George Hall. The defendant didn't sort out checks that were less than $1,000 and say, here, take these back. I don't want them. He kept them. He kept them because that's clearly his intent was to cash those checks. Well, maybe not to cash them. We don't know what his intent was. We know he kept them. We know that we kept them. And I also want to make sure that there's not a misperception here that the only checks destroyed or the only reason checks were destroyed is because they were for $1,000 or less. On the record, if you'll take a look at the testimony for Eric Muhammad, who was sort of the distribution center for these checks, when it came time for him to destroy checks, he would destroy checks because they were too old, which is to say they hadn't been used in two or three weeks, and at that point under the scheme they were too old and too dangerous to cash. Most of the people involved in this, if not all of them, were African-Americans. Some of the checks had Asian names. An African-American isn't going to walk into a bank and cash a check that bears an Asian name. That's not going to happen. Some of the checks were two-party checks. That becomes too complicated. Some of the checks were corporate checks. That becomes too complicated. When you grab 600 to 700 checks, you're going to get a bundle of all sorts of checks. He kept those checks until he could not use them or felt they were too old to be used. Then he ordered them destroyed. Not because he never had any intention to use them. If he could have used all 600, he would have. It just turns out that some of the ones in the bundle he couldn't use. But the intent, when he tells Hall to steal those checks, is to use every single one that's in the bunch if he can. I don't want to pass over the waiver argument that's been presented in these documents, Your Honor, in the record on appeal. The government contends that with regards to laws, that argument has been waived by the defense. Now, the defense in its reply brief says that the government can't make that argument because it's sentencing. We waived that argument. He quotes the government, myself, as basically saying that the defense is free to argue whatever it wants. And the district court says the same. But I do want the court to focus on the context in which those statements are made. The excerpt of record, particularly pages 95 to 114, the district court goes into a long explanation of its view of sentencing in the post-Booker world. And in the post-Booker world, the district court explains to the defense counsel, look, you may have stipulated to 20 levels. But if you want to argue to me that even in spite of that stipulation, that would not result in an appropriate sentence under the 3553A factors, that it's not an appropriate sentence in this case, you're still free to do that. And the court even tells defense counsel, although you may do that, counsel for the government may stand up and say, Your Honor, they're bound by the plea agreement. But in the post-Booker world, the district court cannot look at defense counsel and say, you are forbidden to argue this. It is in that context that the government says, yes, Your Honor, the defense is free to argue whatever it wants. I stand here today and say the defense is free to argue whatever it wants. I would much rather respond to an argument that in the government's position has been waived, as opposed to having to confront an argument that has been adequately preserved for appeal. So I would draw the Court's attention to the plea agreement itself, paragraph 15, which is in the government's excerpt of record, whereby the parties agree that even on appeal, they will maintain their position that the sentencing guideline calculations set forth in the plea agreement are appropriate for this case. I see no way that the defense can get around that provision in the plea agreement. So I believe that argument is waived. I believe that the loss calculation was stipulated to in the plea agreement. Even outside of that, at sentencing, the Court had the benefit of testimony from George Hall himself, the person who actually physically stole the checks. Who better would know how much the checks were worth and the value of the checks that were stolen? He testified, 6,700 checks worth approximately $18 million. And to this day, the defense does not contest that that number of checks was stolen, or that the face value was over $18 million. The Court made a finding by clear and convincing evidence that the loss amount was accurate. And I would also note that under the guideline provisions, the loss, the calculation of loss by the Court, the Court is required under 2B1.1, note 3, to make a reasonable estimate of the loss. That estimate, based upon the plea agreement, the PSR, the testimony at sentencing, the Court made that reasonable estimate. And under the guidelines, that reasonable estimate is entire to appropriate deference. If the Court has any questions for me, I'd be happy to answer. Otherwise, I would submit them. Thank you, Your Honor. Since I let you run over, we're going to give you one minute of rebuttal time. I'll go quick. First, with respect to the waiver issue, the defense specifically objected. They entered into the plea agreement. Once the pre-sentence report came out, the defense attorney realized he made a big mistake. He specifically objected to the loss amount and vigorously argued that the loss amount was incorrect at the sentencing. The government had every opportunity to withdraw from the plea agreement at that point under the terms of the plea agreement, and they didn't. They sat on their hands while the defense objected to the loss calculation. So the issue hasn't been waived. It was specifically objected to. And the government can still today, if they want, they can withdraw from the plea agreement if they want to. They have that option under the plea agreement. And so the argument has not been waived. The final thing with respect to when you look at the loss, I believe under the intended loss, I believe under this Court's precedent, and it's United States v. Shaw, which is the case we mostly rely upon, which is 3 after 311, in that case it was an intended loss case, and it was the defendants were arguing that they fraudulently obtained a loan, and they were arguing that they intended to repay it. And this Court said, yes, you can look at that subsequent intent. Counsel, your time has expired. We thank you very much for your argument. The case of U.S. v. Marsh is submitted. We will next hear argument in the case of Strong v. Sullivan. Good morning, Your Honors. Gretchen Fusilier appearing on behalf of Petitioner Appellant Mr. Strong. If it please the Court, I would like to preface my argument this morning, Your Honors, with the representation that I received, written correspondence from Mr. Strong, indicating that he no longer wants to argue or go forward with his position to withdraw the plea as one of the remedies, but would prefer to go forward only with the remedies of either striking the restitution orders or to remand for further consideration by the Court. Having said that, Your Honors, I would briefly like to address the exhaustion issue that was raised by the State. And we would point out, essentially, that the State, in its answer to the Federal State prisoner's habeas corpus petition, conceded that the claims had been exhausted in the State court by bringing the habeas corpus petitions to the California Supreme Court. And that the State conceded that the State had exhausted, I mean, you find it exhausted by bringing the case before the State Supreme Court? Your Honor, in our excerpts of record at page 150, this represents the answer to petition for rid of habeas corpus by the Respondents. Right. And it indicates Strong's petition raises three claims, that he should be allowed to withdraw his contest plea, his no contest pleas, that he was denied effective assistance of counsel, and that this Court should compel the State courts to issue a certificate of probable cause. These claims are exhausted because they were presented to the California Supreme Court as a petition for rid of habeas corpus. These claims are exhausted. And what, I thought you said this was what was submitted to the California Supreme Court. This is the State's answer in the district court. I see. To the petitioner's Federal habeas corpus petition. So you're, in effect, arguing that the State is stopped by its pleading? Essentially, yes, Your Honor, because of the inconsistency that they are now proceeding on. And, however, we would like to also augment that in case this Court should find, contrarily, that if we look at the cases that were cited by the petitioner in the appellant's opening brief, we see that he has met the threshold requirements to establish the three claims that he raises. He used for the ineffective assistance of counsel key Federal language that essentially ineffective assistance of counsel, failure vis-a-vis the involuntariness of his plea and advisement under due process requirements to be aware of direct victim restitution, that he had not been advised of the consequences of his plea, thereby rendering his plea involuntary and not knowingly entered. As the case of Sanders v. Ryder, which we have cited in our brief, indicates that where the Federal and the State remedy is the same, an ineffective assistance of counsel analyzed under the Sixth Amendment, and in Ryder, the petitioner did not cite the Sixth Amendment, did not cite Strickland, but referenced the ineffective assistance of counsel. You realize that this is an uncertified issue for purposes of this panel. We have not granted a COA on the issue of the ineffective assistance of counsel. You're welcome to argue it, but I just want to mention that to you. I understand. All right. Thank you, Your Honor. And the reason we did raise it as an uncertified issue because of the order offered or entered by this Court that any uncertified issues should be raised pursuant to Circuit Rule 22.1, I believe. Proceeding on the restitution issue, we would indicate that at the time that Mr. Strong entered his guilty plea pursuant to a preprinted plea of guilty form provided by the government or by the State, there were three different forms reflecting three different cases. And it's interesting, as we have pointed out in our papers, that the colloquy at the plea hearing failed to reflect any information to Mr. Strong that these cases were being handled sequentially and separately. Moreover, Mr. Strong's representation at the sentencing hearing, that he was under the impression that these were consolidated, thereby being resolved jointly, was a reasonable interpretation given the handwritten modification in the three different plea, preprinted pleas, which we have inserted in our excerpts of records at page 54 at SEC. It indicates that the first case is the primary case. The second and third preprinted forms have been written in. These are subordinate to the primary case. Failing any clarification or specification by either the deputy district attorney or the court at the time of taking this plea, even though the court might have had been deliberating under a different set of assumptions, there is no basis to understand that Mr. Strong was. And we think that is extremely important in determining whether or not that part of the sentence was appropriate given the plea he entered. Moreover, the government does not dispute the fundamental constitutional requirement that in order to have a valid plea on which a petitioner, in this case Mr. Strong, was sentenced, must fully inform him of the consequences of his plea. And we have cited cases in our opening brief and reply brief supporting, obviously, that fundamental constitutional precept. I neglected to ask you whether you want to reserve any rebuttal time, and if so, how much? Two minutes, Your Honor. Two minutes. Okay. Thank you. The government's position, however, indicates that Mr. Strong was sufficiently informed that his plea was sufficiently set forth in the preprinted or the sentencing guilty forms. However, when we look at that at our excerpts of record, page 53, we see that there is language indicating that I shall be required to pay a mandatory restitution fine of not less than 200 nor greater of 10,000 and subject to a penal fine up to 10,000 and then a parenthesis with language referring to the health and safety code. You're now at the two-minute mark. If you want to reserve your time, you might want to hold that good thought and come back with it in a moment. All right, Your Honor. May I just briefly say that in reference to what he reasonably knew and what he was informed specifically, there's no basis on which to cumulatively indicate that he knew he would be subjected to a 60,000 restitution fine. Okay. We'll now hear from the government. Good morning. May it please the Court? I'm Kevin Biena, Deputy Attorney General, appearing on behalf of Appelli Respondent. Well, I'm surprised, well, perhaps not surprised, that Mr. Strong doesn't want to withdraw from the plea agreement. He sort of wants part of it and not part of the rest of it. I think that reflects strongly on what his attitude, knowledge, and understanding was at the time that he entered the plea agreement, at the time that the plea agreement was accepted, and the time that he was sentenced. I'll return to that in a moment, if I may. I would like to make one comment about the exhaustion argument. We did concede that he had exhausted the claim in the state court, the claim that his plea should be withdrawn because he had not been advised specifically of victim restitution. Our argument, though, at page, you can see it at page 172 of the excerpts of Record Note 3, was that he had not raised a federal claim in the state court, that his claim in the state court relied on a case called People v. Walker that expressly stated it wasn't relying on the federal court. We believe that was unexhausted. That's the second point. So just to make sure I understand this, the government conceded exhaustion of the state remedies, but not of the federal remedies? We conceded that he exhausted a state claim in the state court, but not the federal claim that we thought he might be seeking to expand in the federal court, or the federal court might consider under its requirement to liberally construe. The claims of a petitioner. Importantly, his habeas petitions in the state courts were not pro se petitions. He was represented. Addressing whether the certified issue, I think, is whether his plea was knowing and voluntary based on the information provided by the state court to him. He signed three plea forms. Each of the plea forms told him that his pleas to those cases could cost him $20,000. $10,000 as the upper limit in a restitution fine, $10,000 in the upper limit of a fine. So there's nothing in the colloquy, in any of the forms, suggesting that that's other than the upper limit. And what's important here, I think, is the federal law as stated by Brady v. United States. The key is whether the advice to an accused indicates, and here's my quote, the actual value of the commitment by the court. That's at 397 U.S. at 755. The actual value. The advice provided by the court is that the financial consequences of his pleas were just under $20,000. But even if you looked at it as just one of the plea forms, even if there had been only one, he was told this could cost you up to $20,000. In the event, it cost him less than $20,000. We believe he has nothing to complain about there. In the state determination in the trial court that his plea remained voluntary despite what I would say is not an objection but an opportunity to enter into further negotiation to try to get a better deal, was simply that he said, you know, I didn't know it was going to be. I didn't know what the restitution amount was going to be. The trial court didn't just disregard that. They inquired of defense counsel. Did you talk to him about restitution? Defense counsel said we discussed every aspect of the plea. Now, we don't know precisely what that is. And Mr. Strong has never told us precisely what every aspect of the plea was. But we do know that four days before he saw the probation report, four days before the sentencing, he saw the probation report. And in the probation report, it said that the victim of the tool cue attack had suffered $3,800 worth of financial damages. So we know from the record and from Mr. Strong's own statements that he was seeking counsel in advance of the sentence. And then we know when sentence was announced, he said, gosh, this is more than I thought. No one told me that I might have to pay this much direct, that I might have to pay this much direct this victim restitution. And I might have sought a different deal. Now, that seems unlikely. He got a 13-year deal he was facing easily 25 years for these three cases. And importantly, the Superior Court, when it dealt the only decision on his habeas corpus petition, the only written decision or opinion on his habeas corpus petition, says there is no way he would have he just wasn't concerned about the financial aspects of this. He was concerned about not spending 25 years in prison. But there are, I cited four cases in my brief that are similar, similar, and that say that what is required for adequate notice to a defendant is to provide, in general, the maximum of the financial consequence that the defendant might face. And Mr. Strong certainly had that. His complaint really is that he should have been instructed on the various statutory schemes in the state of California that might give rise to financial consequences. The difference between restitution, fine and restitution, the difference between restitution and punitive fines. The United States Supreme Court has not said that. This Court has not said that. And the four other circuits that I cited suggest that that is unrealistic and impractical. Mr. Viena, can you tell us succinctly what you think the bottom line of this Court's holding should be in this case? If the Court were to publish an opinion in this case, I think the bottom line should be that if a defendant is advised of the upper limit of financial consequences, and if the sentence that is awarded is within that upper limit, there's no due process violation, and there's no indication that the plea is involuntary. You've answered. The reason I wanted you to do it, she's going to rebut. She's got a short time. She might as well know what she needs to rebut. I think it's important that this claim, that the plea was involuntary based on improper advice from the trial court, that claim is procedurally defaulted because he didn't properly raise that claim in his direct appeal, and the court of appeal said you can't bring it before us. He never addressed that before the district court. In the reply brief, he has not addressed it in this court. Perhaps he concedes that it's not a matter of the district court, but at least because the district court chose not to address that issue, this court can't give relief at this point. Thank you, Your Honor. Thank you very much. You have about a little over a minute and a half for rebuttal. Yes, just briefly. I'm going to go straight to the restitution point because that's primarily what your client is concerned about, isn't it? Yes, Your Honor. At this point, I would think it's very important to say that the key word, as used by the Deputy Attorney General, is if he were advised of restitution. And as is very obvious from the State's argument, they are using the words such as Mr. Strong was told that his financial liability would be up to $60,000. Yet, they concede that during the plea colloquy, there was no reference whatsoever made to a restitution fine, a penal restitution, a restitution fund fine, direct victim restitution. So he was never told. And one has no evidence. You know the problem with the argument? His primary concern was what he was facing jail time-wise. The restitution fine was in the hop-up, but it wasn't his primary concern. He entered into a plea agreement to avoid the jail time, and the restitution came along with the package. Your Honor, I believe that when we read the Santabello case, which I cited in our brief, it's clear that even if oversight of constitutional proportions is inadvertently made, it is still a constitutional deficiency. And I think it's very important that we understand that and in this case, the U.S. Supreme Court has held that a voluntary plea must cover all of the consequences of the plea, so that it can be determined to be knowingly and voluntarily made. So what should this Court decide? That there is no plea agreement, and the matter should be remanded for consideration of trial, or what do you think we should decide? I think this Court should decide that this case is distinguishable from Runk, which was cited by the State, because in Runk, the petitioner therein, he had known that he would be facing a restitution fine, not direct, and a restitution fine was imposed. So that is distinguishable for this case. I think the holding in this case should certainly reference that there is a no evidence to objectively conclude that Mr. Strong had been aware at the time of entry of the plea of his restitution in any amount directly to a victim or otherwise, and therefore, it should be stricken. However, if this Court is unlikely inclined to ---- Why don't you assume that? I think I am. That's why I have said that, Your Honor. But in that eventuality, I would hope that this Court would consider a ruling for remand to determine specifically what the comment, I discussed all aspects of the plea with Mr. Strong, might have meant, because otherwise, there are assumptions and conclusions that are not supported by the record. I'm not trying to be clever, but you know, and I know, that your client is delighted with the plea agreement, except he doesn't want to pay a restitution. Isn't that pretty much the status of this? Well, Your Honor, I think that the restitution constitutes a vital component of the consequences of the plea. And I think from a constitutional viability perspective, that we need to address that. And I do think that there is merit to that position in this particular case. Any other questions to the panel? Thank you both for your argument. The case of Strong v. Sullivan is submitted. We will next hear argument in Sirocco v. Garcia.
judges: Farris, Smith, Sandoval